# EXHIBIT B

OSMANY SANCHEZ
8/22/2018

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

JAMES ALLEN, JR.
and RACHEL ALLEN,

      Plaintiffs,          CIVIL ACTION NO
                       5:18-CV-00145-MTT

vs.

OSMANY F. SANCHEZ,
CARIBE TRUCKING CO.,
LLC, and STARR INDEMNITY
AND LIABILITY COMPANY,

      Defendants.
_____/

DEPOSITION OF:    OSMANY F. SANCHEZ
ON BEHALF OF:    The Plaintiff

DATE:           Wednesday, August 22, 2018

TIME:           10:20 a.m. to 1:15 p.m.

PLACE:          Signature Flight Support
                  TMB-Miami Executive Airport
                  14150 SW 129th Street
                  Miami, Florida 33186

REPORTED BY:     Rebecca Hughen

Page 2

APPEARANCES:
Bradley J. Survant, Esq.
Reynolds Horne & Survant
6320 Peake Road
PO Box 26610
Macon, GA 31221-6610
Bjsurvant@wcrpc.com
(478) 405-0300
    Attorney For Plaintiff.

Michael Andrew Echols, Esq.
Lewis Brisbois Bisgaard & Smith LLP
1180 Peachtree Street NE, Suite 2900
Atlanta, GA 30309
Andrew.Echols@lewisbrisbois.com
(404) 348-8585
    Attorney For Defendant, Osmany F. Sanchez.

Jon Christopher Wolfe, Esq.
Chambless Higdon Richardson Katz Griggs LLP
3920 Arkwright Road Suite 405
Macon, GA 31210
cwolfe@chrkglaw.com
(478) 745-1181
    Attorney For Defendant, Starr Indemnity and.
    Liability Company.

ALSO PRESENT:  Mario Camara, Spanish Interpreter

Page 3

INDEX OF WITNESS AND EXHIBITS

                                  PAGE

Testimony of OSMANY F. SANCHEZ:
Direct Exam Mr. Survant           12
Certificate of Oath               86
Certificate of Oath               87
Certificate of Reporter           88
Errata Sheet                    89

PLAINTIFF EXHIBITS:
Notice of taking deposition       7
Caribe Trucking document dated 7/8/18  74
IRS document                   74
Contract with Caribe Trucking     74
Employment verification form     75
Employment verification form     76
Copies of current resident card
and Florida Driver's License, and
Social Security card             76
Medical Examiner's Certificate    76
Driver's road test examination
Record of Road Test              77
Certification of Road Test      78
Alcohol Testing Form           78

Page 4

Certificate of Compliance with
Cellphone texting bans           79
Document titled The World of Signs   79
Certificate of Liability insurance  80
Apportioned Cab Car             80
Record of Annual Inspection      80
Preemployment drug test          81
Driver Documentation Receipt     81
Federal Drug Testing Custody and
Control Form                  82
Florida MVR Report              83
Request for Check of Driving Record  83

1 (Pages 1 to 4)

BRICKELL KEY COURT REPORTING, LLC
305.407.9993

Page 5

Miami, Florida

10:20 a.m.

Wednesday, August 22, 2018

(All answers through interpreter unless otherwise noted.)

COURT REPORTER:  Do you swear or affirm to correctly translate from English to Spanish and from Spanish to English to the best of your ability?

THE INTERPRETER:  Yes.

COURT REPORTER:  Do you solemnly swear or affirm that your testimony shall be the truth, the whole truth and nothing but the truth, so help you God?

THE WITNESS:  Yes.

MR. SURVANT:  This will be the deposition of Mr. Osmany Fernandez Sanchez, taken by the Plaintiff for purposes of discovery, cross-examination, and all other purposes permitted by the Federal Rules.

I would suggest that we waive all formalities and reserve all objections, except to the form of the question and responsiveness of the answer; if that's okay with all.

MR. ECHOLS:  Agreeable.

Page 6

MR. WOLFE:  That's agreeable with me.

MR. ECHOLS:  Can you let Mr. Fernandez know before we get started that I may say "objection" from time to time for legal reasons as to the question, but he may go ahead and answer unless I say otherwise?

(Interpreter complies.)

MR. SURVANT:  Exhibit 1, Plaintiff's Exhibit 1 to the deposition will be the notice of deposition.

(Plaintiff Exhibit Number 1 was marked for identification)

MR. SURVANT:  And just so I can figure out what we've got and what was produced, as requested...

Number 1 seeks any logbooks or similar documentation pertaining to Mr. Sanchez' operation of the vehicle for 14 days prior to the accident.

I didn't see any of that.

Do you have any of that in the documentation that you provided.

MR. ECHOLS:  We don't have that.

It may be in storage, as I

Page 7

understand it, so we are trying to locate if the logs are still in storage.

THE INTERPRETER:  The interpreter needs to clarify.  Is this interchanges between lawyers, or do you want me to interpret?

MR. SURVANT:  Yeah, I think just lawyer stuff at this point.

Number 2 is any documentation reflecting any hours worked in that same period of time.

Same situation?

MR. ECHOLS:  That will be in his logbook as well.

MR. SURVANT:  Number 3, any documentation pertaining to daily pre-trip, daily, post-trip, or any other inspection of the tractor or trailer involved in the subject occurrence.

Is there any such documentation?

MR. ECHOLS:  Not for the daily incident.

There is the DOT annual inspection in that file.

MR. SURVANT:  In the documents you provide?

Page 8

MR. ECHOLS:  Correct.

MR. SURVANT:  Number 4 is any documentation reflecting any inspection, maintenance, repair or replacement of any tire or wheel on the subject tractor for a year up to and including the day of the accident.

Is there any documentation that you are aware of that exists pertaining to that item?

MR. ECHOLS:  There may be documentation that exists, but it's not in that file.  We are looking for that.

The tractor was owned by Mr. Fernandez, so we haven't located it at this time.

MR. SURVANT:  Number 5 is any documentation reflecting any training or instruction provided to Mr. Sanchez by Caribe Trucking, LLC, relative to his inspection and maintenance and operation of a tractor-trailer.

Is there any such documentation?

MR. ECHOLS:  There is a documentation as it relates to road tests and evaluations performed at the time that Mr. Fernandez entered the lease.

2 (Pages 5 to 8)

Page 9

MR. SURVANT:  And that's in the document --

MR. ECHOLS:  That's in the file.

And I believe there is also a document related to the company's policy on cellphone usage.

MR. SURVANT:  I saw that.

MR. ECHOLS:  It's in the file.

MR. SURVANT:  Number 6 is any bills of lading or similar documentation reflecting any information pertinent to the load or loads being transported by Mr. Sanchez for seven days prior to and through the date of this subject occurrence; is there any documentation that fits that category and is provided?

MR. ECHOLS:  None of that stuff we looked for.

MR. SURVANT:  And then number 7, any documentation reflecting the ownership of the tractor involved in the occurrence; any documentation of this material?

MR. ECHOLS:  Not in the papers there.

Mr. Fernandez may have that, but it's probably going to be in the truck if he

Page 10

has it.

MR. SURVANT:  And number 8, any documentation reflecting ownership of the trailer involved in the occurrence.  Is there any documentation in that category, provided to that?

MR. ECHOLS:  Not on the trailer.

MR. SURVANT:  And what you have given me, Andrew, I have marked as Plaintiff's Exhibits 2 through 22.

I may have marked a document as more than one exhibit, but that's the extent of the documentation that you produced in response to our notice for deposition, correct?

MR. ECHOLS:  At this time, that's correct.

MR. SURVANT:  And in terms of identifying what each of these are, is it easier do you think to go through you first, and then Mr. Fernandez, or should I just ask him about each one?

MR. ECHOLS:  I am not the preparer of those documents.  A lot of them speak for themselves.  Most of this information came from

Page 11

his driver file, so they say the document doesn't identify what it is on the face of the document.

I would be happy to try to discuss it with you, but, again, I just can't -- as not being the person that authored the documents, I can give you my best guess.

MR. SURVANT:  And to the extent we need to reserve our right to redepose Mr. Fernandez, in the event that there are additional documents that we have requested today that are later produced, we would reserve the right to do that.

DIRECT EXAMINATION
BY MR. SURVANT

Q.  Tell us your name, please, sir.

A.  Osmany Fernandez Sanchez.

Q.  Should I call you Mr. Fernandez or Mr. Sanchez?

A.  Just like normal Fernandez Sanchez.

Q.  Okay.  Where do you live, Mr. Fernandez Sanchez?

A.  Miami, 12260 Southwest 186th Street.

Q.  How long have you lived in the Miami area?

Page 12

A.  Around like four years.

Q.  Where are you from originally?

A.  Cuba.

Q.  How long have you been in the United States?

A.  Six years.

Q.  What is your residency status?

A.  Resident.

Q.  Do you have a Green Card?

A.  Yes.

Q.  When did you first get your Green Card?

A.  I entered the country in 2012, and two years after is when I received it.  A year and -- or two years after is when I received it.

Q.  How long ago from today did you get your Green Card?

A.  I don't remember exactly the date.

Q.  Do you speak English at all?

A.  Some.

Q.  Are you able to read English at all?

A.  No.

Q.  We are here today, Mr. Fernandez Sanchez, about an accident that happened in January of 2018.  Do you recall that accident?

A.  Yes.

3 (Pages 9 to 12)

OSMANY SANCHEZ
8/22/2018

Page 13

Q.  And I want to talk to you first about the tractor you were driving at the time of the accident.  Who owned that tractor?
A.  Me.
Q.  Did you own it as an individual, or as some sort of company, a corporation?
A.  I have a corporation.
Q.  What is the name of that corporation?
A.  Osmany -- I can show it to you better, because it's better.
Q.  Okay.
         That's Osmanymdmguez Transportation Corp. is what it looks like.
A.  Yes.
Q.  Are you the sole owner of that corporation?
A.  Yes.
Q.  And as of the date of this accident, how long had you been driving that particular tractor?
A.  It had been like -- I don't recall exactly, but two years.
Q.  Who was responsible for maintaining that tractor during that two years prior to this accident?

Page 14

A.  Me.
Q.  And at the time of the accident in January 26, 2018, how many tires were on the tractor?
A.  How many tires?
Q.  Yes.
A.  The 10 tires of the tractor.
Q.  I assumed that was the answer, but 10 tires?
A.  The truck.
Q.  The truck, tractor?
A.  Ten.
Q.  There were two on the front, and the rest were in the rear?
A.  Right, two in the front, and eight in the back.
Q.  During the two years prior to this accident, did you or your company have any sort of regular maintenance schedule relative to those tires?
A.  Oh, yeah.  Yes.
Q.  Tell me what it was.
A.  Well, schedule with dates, no, I don't remember that.
Q.  Do you know how old any of the tires on

Page 15

the tractor were as of the date of the accident?
A.  Can you repeat that?
Q.  Sure.  Do you know how old any of the tires on the tractor were as of the date of the accident?
A.  No.
Q.  Do you know if any of the tires on the tractor had ever been replaced in the two years before the accident?
A.  Yeah, they were new.
Q.  When were they new?
A.  I don't remember.
Q.  About how long ago before the accident did you get them?
         MR. ECHOLS:  Object to form.
A.  I don't remember exact date.
BY MR. SURVANT:
Q.  Would all ten tires had been bought at the same time?
A.  No.
Q.  The two tires up front are called steer tires; is that right?
A.  Well, steer tires, no, I don't know.  I don't know what that means.
Q.  Okay.  Do you have any idea how old the

Page 16

tire that you had the accident with, the one that blew, how old it was as of the date of the accident?
A.  Not exactly, no, I don't.
Q.  Do you have an estimate?
A.  No.
Q.  Was it a month old, a year old, two years old, or older than that?
         MR. ECHOLS:  Object to form.
A.  No, more than one month.
BY MR. SURVANT:
Q.  Where did you get it?
         Where did you buy it?
A.  I don't remember.
Q.  Do you know when it was purchased?
A.  No.
Q.  Was it purchased?  Did you buy it?
A.  Yeah.
Q.  You have no idea from whom?
A.  No.
Q.  When you bought it, was it bought with other tires, or was it the only one you bought?
A.  No, only those two tires.
Q.  The two front tires?
A.  The front ones, American made,

BRICKELL KEY COURT REPORTING, LLC
305.407.9993

OSMANY SANCHEZ
8/22/2018

Page 17

Firestones.

Q. The two front tires that were on the tractor at the time of the accident were bought at the same time?

A. Yes. Yes, sir.

Q. And you don't know when that was?

A. No.

Q. Could it have been a year before the accident?

A. No, before that.

Q. What's the longest you think it was before the accident?

MR. ECHOLS: Object to form.

A. I don't remember.

Q. When the front tires were put on, were they rotated at all before the accident?

A. No.

Q. So once the front left tire was put on, it stayed in that same position until the accident?

A. Yes.

Q. Who put the tire -- the front tires on?

A. The person who does the tires for trucks.

Q. You didn't do it yourself?

Page 18

A. No.

Q. It was some tire company or trucking company that put the tires on for you?

A. Yes.

Q. When you got the front tires, were they bought new or used?

A. New.

Q. I knew that one.

Do you recall the make and model of the tires, the front tires?

A. Firestone, I think they were.

Q. Were they the same type, the front two tires?

A. Yes.

Q. And do you have any idea as to the number of miles that the life expectancy was for a tire such as that?

MR. ECHOLS: Object to form.

A. Can you repeat that?

Q. Sure. Do you understand the tire may have a limited life expectancy?

A. Yes.

Q. Either they get too old, or they get too many miles on them?

A. The tires read an expiration date, and

Page 19

have a date in which they were made.

Q. Do you know what the expiration date was on these tires?

A. I don't remember.

Q. Do you know the date of the manufacturer of these tires?

A. I don't remember.

Q. Do you know if there is any limit on the amount of miles that is recommended be put on these tires?

MR. ECHOLS: Object to form.

A. Yes.

Q. And what is that recommendation?

MR. ECHOLS: Object to form.

A. I don't know the number exactly.

Q. About what?

A. I don't know.

Q. Do you have any idea of the number of miles that had been put on these two front tires as of the time of the accident?

A. No.

Q. And can you tell me a little bit about your trucking background, and when you started driving trucks, that sort of thing?

A. Like a trucker in this country?

Page 20

Q. Okay. Let's do that first.

A. I began -- I began working at Caribe as a trucker.

I began working as a trucker over there at Caribe.

Q. When?

A. When I began.

If it's 2018 now, then '16. '16.

Q. Do you know what year it was?

A. I think it was in 2016. 2016.

Q. Was that Caribe the first place you worked as a truck driver in the United States?

A. Yes.

Q. And it sounded like you may have been a truck driver in Cuba, or somewhere else?

A. Yes, in Cuba I was a trucker.

Q. How long were you a trucker in Cuba?

A. Many years.

Q. Okay. Did you work for yourself, or for a company in Cuba?

A. No, in Cuba you work on your own, not for a company.

Q. Did you drive 18 wheel tractor-trailers in Cuba?

A. Yes.

5 (Pages 17 to 20)

BRICKELL KEY COURT REPORTING, LLC
305.407.9993

Page 21

Q.  Did you go to any sort of school or training for driving trucks in Cuba?

A.  You go through school to get your license.

Q.  What is the name of that school?

A.  No.  That's like -- that's like a DOT here.  But, no, it has no name.

Q.  Did you actually go to a classroom and somebody teach you how to drive a truck?

A.  No.  No.

Q.  Is Caribe Trucking Company the only company you have driven for in the United States?

A.  No.

Q.  Who else have you driven for?

A.  I work at -- in Virginia.

Q.  Who, in Virginia?

A.  For a company called -- I don't remember right now what it was called.  I don't remember what the name of the company was.  It was an American company.  I don't remember the name. It was at the port.

Q.  How long did you work for that company?

A.  Months.

Q.  Other than the Virginia company, have

Page 22

you worked for any other trucking company other than Caribe while in the United States?

A.  Yes, but I don't remember the name of the company, or how long I was there.  It was only, what, one month in the past.

Q.  Since 2016, has the bulk of your income, as a truck driver, come from Caribe Trucking Company?

A.  Until I was at Caribe, but now I'm working at another company.

Q.  Fair enough.  When did you leave Caribe?

A.  Six months ago, approximately.

Q.  Why did you leave?

A.  It's to another company that I work here at the port locally.

Q.  What's the name of it?

A.  ACE Transport.  ACE.

Q.  You have been with ACE Transport for about six months?

A.  Yes.

Q.  But before ACE, most of the money you made driving trucks was from Caribe Trucking Company?

A.  Yes, in Caribe.

Q.  And do you recall when it was that you

Page 23

started with Caribe exactly?

A.  No.

Q.  Could you tell me a little bit about the process that you went through when you were hired by Caribe Trucking?

A.  Yes.

Q.  Tell me about it.

A.  My own process?  Or --

Q.  Yes.

A.  Well, they asked you for all of your personal documentation.  All of the data information for the truck.  To -- the inspection, annual inspection that they require. In addition, that Caribe, before you start working there, they do an inspection for you.

Q.  Of your truck?

A.  Yes.

Q.  So when you start working for Caribe, they do an inspection of your truck?

A.  Yes.

Q.  After that initial inspection, does Caribe trucking do anymore inspections of your truck?

A.  Yes.

Q.  When?

Page 24

A.  Well, no.  Every certain time period they have a...

Q.  What certain time period?

A.  I don't remember.

Q.  Do you remember the last time your vehicle was inspected by Caribe prior to this accident in January 2018?

A.  I don't remember exactly the date.

Q.  How about approximately the date, when was it?

A.  I don't remember.

Q.  When you put the two tires on the front of your tractor that were there at the time of the accident, why did you buy those tires?

A.  When I put in the tires, what?

Q.  Well, did they replace two tires?

A.  Yeah, of course, of course.

Q.  And why did you feel the need to replace those two tires on the front of the tractor?

A.  The thing is that they require it obligatory.

Q.  Who is "they"?

A.  DOT, Caribe.

Q.  Your understanding, though, is that the two front tires that were on the tractor at the

BRICKELL KEY COURT REPORTING, LLC
305.407.9993

Page 25

time of this accident were replaced because either Caribe or the DOT told you you needed to replace your front tires?

MR. ECHOLS: Object to the form.

A. The tires that it had on it.

Q. That you were told they needed to be replaced?

MR. ECHOLS: Object to form.

A. No. No. No. Drivers, we know well how the tire rolls. We know if it's good or not according to how much time its been being used. When it is that it has to be changed. But when DOT tells you you have to change your tire, it's like, how can I put it?

Like when DOT requires you to change a tire, that's when, I mean, DOT makes a report on you. We -- with bad tires, we can't go out on the road with our company. With any company, you can't.

Q. Did you replace the two front tires because they had worn out?

A. Yes.

Q. And once you put them on the front axle, they stayed from the time they were replaced until the time of the accident?

A. Yes.

Page 26

Q. Did Caribe provide any training to you when you began driving for them?

A. Training for work.

Q. What type of training did they give you?

A. How the work was done at Caribe.

Q. Did they give you any training as far as inspecting the truck?

A. Yes.

Q. Tell me about that.

A. We comply with an inspection. That they bring in the book. In the book. And that we have to do it before setting out on each trip that we make.

Q. And the book you are talking about, was that a Caribe book or a DOT book?

A. A DOT book.

THE INTERPRETER: The interpreter needs a clarification of "that is given to Caribe before each trip".

(Clarifying in Spanish with witness.)

A. It's a book required by DOT, and, well, that book is -- log -- is a book that each driver has anew, handed over to Caribe, before each trip.

Q. The tire that came off the wheel or you

Page 27

had a problem with on the day of this accident, do you have any idea where it is?

A. No, no. That tire, no, no. That was a tire that was all ruined, ruined totally.

Q. You never attempted to retrieve any piece or part of that tire after the accident?

A. No, DOT was -- the DOT was the ones at the scene.

Q. The DOT, or the police?

A. No, the police arrived, and DOT.

Q. Do you have any of the inspection reports you have ever done for that tractor?

A. All of those reports DOT keeps them and Caribe another.

Q. Did Caribe train you how to do a pre-trip inspection, or did you already know how to do one?

MR. ECHOLS: Object to form.

A. Caribe teaches you how to work along with them, with the book.

Q. Tell me what you understood to be a proper pre-trip inspection, the steps you would go through.

MR. ECHOLS: Object to form.

A. We have to check. We check the tires of

Page 28

the truck, or the trailer. The lights, the brakes, the wipers. The wipers, the brakes, the lights. The lights -- well, we check what would be the tractor or the trailer in general. We have half an hour to do the inspection.

Q. And do you understand that you are required to do that inspection before every time you leave somewhere driving?

A. Every time you come back from a trip and set out, and that you again have to set out, you again have to do the inspection.

Q. But if you go and drive 100 miles, and stop and get gas, and start again, do you have to do another inspection?

MR. ECHOLS: Object to form.

A. It's not obligatory.

Q. When is it obligatory?

A. You check -- every time you set out for from one location and arrive at another location, and that you unload, and that you are going to leave, you have to do it, you have to check the truck.

Q. And in terms of what is required, as you understand it, as a proper pre-trip inspection, you said you check the brakes, the lights, the

7 (Pages 25 to 28)

Page 29

tires, and the wipers, correct?

(Interpreter clarifying with Attorney Survant)

THE INTERPRETER:  Brakes, lights, tires --

MR. SURVANT:  Tires and wipers.

A.  The wipers, you do a general inspection.

Q.  And as part of the pre-trip inspection, when you inspect the tires, tell me what you are doing.

A.  The air in the tires.

Q.  How do you check that?

A.  When we are on the road, we are on the road, we have a -- in fact the tires we have, we have -- we know upon looking at them, the quantity of air there is, upon seeing they are both on par with each other.

Q.  But in terms of what the PSI is, do you know that at any time?

A.  Yes, the tire has 100 of air for each tire.  Approximately 100.

Q.  How do you know a tire has 100 in it?

A.  Whenever we take a trip, are on the road, and that we arrive, we do maintenance of the truck.  We check all of the -- like we check the truck, the brakes, the tires.  You check all

Page 30

of the air for them in the truck.  You regulate the brakes.

Q.  But I'm asking you specifically about the pre-trip inspection.  Other than looking at the tires, do you do anything else as part of the pre-trip inspection to determine how much air is in them?

A.  No, you check them like that only.  But when you give maintenance to the truck, every certain amount of number of miles, if we see in that inspection something strange as to the tires, we do further check them.

Q.  Were the tires -- was the air pressure in the tires routinely inspected at any particular interval, every month, every six months, every year?

A.  Yeah, every certain mileage, amount of mileage that you do maintenance, general maintenance of the truck.

Q.  How many miles?

A.  It could be -- it depends.  It could be every 7,000 miles, it could be every 10,000 miles.

Q.  After that 7- or 10,000 miles, would you put an air gauge to the tire to see how much air

Page 31

was in it?

A.  When you do the maintenance, you do this.

Q.  Okay.  And as part of the pre-trip inspection, you mentioned you checked the lights, right?

A.  Yes.

Q.  Are those the headlights and the taillights?

A.  Yes.

Q.  Of the tractor and the trailer?

A.  Yeah.

Q.  Tell me how you go about confirming that taillights work on the trailer?

A.  The lights in the trailer light up with the lights at the truck.

Q.  But do you walk behind the trailer to make sure the lights are on as part of your inspection?

A.  Of course.  You put on the lights and you go make a complete round around the truck, light by light, blinker by blinker.

Q.  So you turn the lights on and walk all the way around to see if the lights are on?

A.  Yes.

Page 32

Q.  And then you try the turn signals as well?

A.  Yes.

Q.  And are you required to put the turn signal on, and then go to the back of the trailer to make sure the light is blinking?

A.  Yes.

Q.  And when you are operating a tractor-trailer, and you put your turn signal on, are there blinkers on the tractor as well as blinkers on the trailer?

A.  And on the sides of the trailer.

Q.  One switch activates all of them?

A.  Well, when you activate one, it activates at one time, yes, all of the truck for that -- lights for that on the truck.

Q.  How about brake lights, how do you make sure those are working?

A.  The brake lights?

Q.  Yes.

A.  When you put on the emergency brakes of the truck, the brake lights are on both of the tractor -- the truck, and also those of the trailer.

Q.  I'm just talking about when you hit the

8 (Pages 29 to 32)

OSMANY SANCHEZ
8/22/2018

Page 33

brakes to slow down the vehicle, the brake lights come on the trailer, correct?

A. Yes.

Q. Is that different from the emergency brakes?

A. They are independent. When you press the brake pedal, the stop lights go on. And when put the emergency lights, both lights of the truck panel for the trailer light up.

Q. Okay. And how do you put on the emergency brakes?

A. Its an emergency system that's built into the truck.

Q. You use your hands?

A. Yeah. They are automatic, you activate them, they activates the ones in the trailer and of the truck.

Q. There is a foot pedal brake, correct?

A. Yes, that also.

Q. Is that the brake you use most of the time while driving a truck?

A. The brake.

Q. And then there is a handle for the emergency brake, correct?

A. Yes.

Page 34

Q. And that activates brakes both in the tractor and the trailer?

A. Those also, yes.

Q. When you use the emergency brake, does that activate lights as well?

A. Yes. Yes.

Q. And tell me how you can, as part of your pre-trip inspection, make sure the lights in the back of the trailer come on when you hit the brakes?

A. There are ways. We install more as truckers for safety for ourselves. We have -- in my case, I do have next to my seat, we have something that also we use to detect the air in the tires, too.

Yeah, let me find the right word.

We -- we -- we can -- how do you say -- we can -- we can -- we can lock it in. We can -- we can place it such that it activates with the pedal, with the brake pedal, that we wind up like pressing the brake pedal, and it keeps it pressed.

And then we can go to the back and check. It's a way that we, for ourselves as truckers, have it and do it.

Q. Is that part of the pre-trip inspection?

Page 35

A. Yes. In the pre-trip inspection you have to check all of the lights. All of the lights, yeah.

Q. And you said you have some device within your cab that can keep the brake pedal pushed while you get out of the cab and walk to the back of the trailer to see if the lights are on?

A. Yeah, but that's optional for us as drivers. It's for us to be more sure and safe that yet the back lights work.

Q. Do you also have hazard lights on your truck?

A. Yes.

Q. Are they on the tractor and the trailer?

A. Whatever problem the trailer might have, it says it on the dashboard there of the truck.

Q. My question is whether, if you put your hazard lights on, would a driver approaching from your rear see a flashing light?

A. Yes.

THE INTERPRETER: Interpreter needs a restroom break.

MR. SURVANT: Sure. We can do it right now.

(Recess taken at 11:12 a.m.)

Page 36

(Back on record at 11:16 a.m.)

BY MR. SURVANT:

Q. The device that you have in your cab, you mentioned something about the tires, does it monitor the PSI in the tires?

A. No, that you do by tapping them upon -- tapping them, we can see if they have more or less air in them by tapping the tires.

Q. But if you are driving down the road and one of your tires is leaking air, do you get any sort of warning or a sign inside your cab, any light or siren, or any sort of indication that tells you you have a tire that's losing pressure?

A. No.

Q. In my car, when a tire gets low, there is a little orange tire that lights up on my dashboard. You don't have anything like that?

A. Trucks do not, no.

Q. Okay. The accident that we are here about happened January 26 of 2018 near Macon, Georgia. You said you remembered that?

A. Yes.

Q. When the accident happened, were you on your way home, or were you on your way away from

9 (Pages 33 to 36)

OSMANY SANCHEZ
8/22/2018

Page 37

home?

A. No, to make a delivery over here in Miami.

Q. Where were you coming from?

A. From Georgia.

Q. Where in Georgia?

A. A brewery, beer. I am certain that it is in Georgia.

Q. Do you know what part of Georgia?

A. I don't remember the address exactly, no.

Q. Did you drive from Miami to the beer place, and you were on the way back to Miami when the accident happened?

A. Return from the beer place to Miami.

Q. And I'm trying to get an idea of what your tire itinerary was from the time you left Miami until the time of the accident, whether you just went to Georgia and had the accident, or whether you went to New York and over to Kansas. I'm trying to get some appreciation where all you had driven before the accident.

A. Yes, it's a trip that Caribe has. That you leave from Miami to a slaughterhouse, or a warehouse, a meat warehouse. It's a client/

Page 38

customer that Caribe has there for meat. There I unloaded. I set out to the beer place. And from the beer place, I was coming back to Miami.

Q. Did you load at the beer place?

A. Yes.

Q. The slaughterhouse that you went to from Miami, do you know the name of it?

A. No.

Q. Do you recall where it is?

A. No. Address, no.

Q. Do you know what state it's in?

A. Georgia.

Q. Was it north of Macon?

A. Macon.

Q. That's where it is?

A. Yeah. Uh-huh. Yeah.

Q. The slaughterhouse is in Macon?

A. Yeah, the first stop at Macon.

Q. And then the beer place, is that also in Macon, or is that somewhere else?

THE INTERPRETER: Before the translation of the question?

A. It's one mile away.

THE INTERPRETER: What was your question, for the interpreter?

Page 39

MR. SURVANT: Where the beer place was, whether that was in Macon or not.

A. I don't know. I won't be able to say if it's in Macon itself.

Q. Okay. And what did you deliver to the slaughterhouse?

A. Meat. We have a trip for meat.

Q. Meat?

A. It's a warehouse. Meat. Meat. We take from here to there, meat. I don't know if it's a mixture of different meats, what kind of meat it is.

Q. Are they live animals or not?

A. No, no, no. Not the animal.

Q. It's already processed?

A. Yeah, it's processed meat. Yeah, it's processed meat.

Q. And you took the processed meat from Miami to Macon to one of Caribe's customers?

A. Yes.

Q. And then you were picking up the beer and bringing it back to Miami?

A. To Miami.

Q. And that was also for Caribe Trucking?

A. Yes.

Page 40

Q. At the time of this accident, you were working for Caribe Trucking?

A. Yes.

Q. In other words, the route you were driving at the time of the accident, you were working for Caribe Trucking?

A. Yes.

Q. Did you maintain a log for your driving of that route?

A. Yes.

Q. And what was your practice about preparing your logs, how would you typically do that?

A. Every time we make a stop, it's a logbook that tells you the hours you've traveled and the stops you have made. Where you stop, where you load, where you unload, how much you move, where you move to. It's a following up process that we drivers use for the trip.

Q. And that's an actual book, as opposed to actually typing on a computer?

A. No, it's a book. Well, at this time, it is a -- you type it in, but at that time, it was a book.

Q. And that book was maintained in the cab

10 (Pages 37 to 40)

OSMANY SANCHEZ
8/22/2018

Page 41

at all times?
A. Always.
Q. And then do you periodically turn them into Caribe, or not?
THE INTERPRETER: I'm sorry, I couldn't hear that.
BY MR. SURVANT
Q. Did you on occasion turn them over to Caribe at any time?
A. For each trip?
Q. For that particular trip you were on at the time of the accident, the log for that trip, would that be something you have or something that Caribe has?
A. It could be that they have it, because DOT picked up all of the books. All of our trips each week, we have to give those books to Caribe, though.
Q. And the trip that you made at the time of this accident, was that a multi-day trip or a one-day trip?
A. No, the trip -- the trip depends on the hours. We have end of day 11 driving hours, so it depends. That trip you would make in two days.

Page 42

Q. Well, the accident report has it happening about 8:00 at night; does that sound right?
A. I don't remember, but it could be before. It could have been before.
Q. And I am trying to get an understanding about the driving that you had done prior to the accident. Did you drive -- when did you leave Miami for that trip?
A. I don't remember.
Q. Was it that morning, or the prior day?
A. No. No, the day before.
Q. The day before.
A. From Miami, I left the day before.
Q. Okay. And as far as all of the driving you did before that day, that would be on your logbook, right?
A. Yes. Yes.
Q. And how far would you have driven that first day from Miami on this route?
A. I don't remember exactly. I don't remember -- I don't remember exactly over at that location how many times there are.
Q. But do you know if you made it all the way from the time you left Miami all the way to

Page 43

the slaughterhouse without spending the night?
A. I don't remember that. Because all of that depends on the traffic. It depends on everything.
Q. Could you have driven that morning from Miami, and made the entire route, and then had the accident that same day?
A. No.
Q. Do you have any idea where you spent the night, the night before this accident?
A. It's a trip -- I used to do that route -- I used to do the route. But I don't remember if I remained at the same place of unloading or if before that, somewhere or -- but that trip is exactly reflected in that logbook, because I don't remember exactly.
Q. If you spent the night somewhere, it would be in your logbook?
A. Everything's in logbook.
Q. If you spent the night, are you sleeping in the tractor?
A. Yes.
Q. Not getting a motel room or anything like that?
A. No, no, no. We remained there.

Page 44

Q. Prior to this accident, had you ever had a problem with any of your tires while driving a tractor-trailer?
A. No.
Q. Never had a flat tire before?
A. No. No.
Q. And if you have a flat tire, or a tire that's going flat, as a driver are you trained to do anything?
A. Yes.
Q. What are you trained to do?
A. No, the training speaks more to what velocity you have to travel at. And it's not --
THE INTERPRETER: The interpreter needs clarification. It's not quote, C-A-S-U-A-L, closed quote, that a front tire blow up on you.
Interpreter needs to know what "casual" --
MR. SURVANT: Casual.
A. Look, that is to say, when you have tires that are in good condition, that hardly ever happens. So we always bring with us good tires, so that never happens.
Q. But are you trained that if you are

11 (Pages 41 to 44)

BRICKELL KEY COURT REPORTING, LLC
305.407.9993

OSMANY SANCHEZ
8/22/2018

Page 45

driving down the road and your tire blows out or goes flat, that you are supposed to do anything?

A. No, no. Not that.

Q. As a truck driver, though, if you experience a problem with your truck, for example, a tire, and you are trying to get off the road, you agree that you are supposed to do that as safely as possible?

MR. ECHOLS: Object to form.

A. Yes.

Q. And if you are moving to your right to get off the road, you would put your right turn signal on?

A. To the right.

Q. And you would agree that you would have to yield to all of the traffic in that right lane you entered, correct?

MR. ECHOLS: Object to form.

A. Correct.

Q. And if you have to go yet another lane over to get off the road, you would have to yield again?

MR. ECHOLS: Same objection.

A. Yes.

Q. And each time you change a lane, you as

Page 46

the driver have to make sure that it's clear to do so, right?

A. Yes.

Q. And how do you do that to the right? What do you look at to determine -- how do you determine if there is anybody in the lane to your right before you change lanes?

A. We as truck drivers, we know that we have to keep a certain distance to make any turn or a movement that we are going to be making, and so you gauge the time that if there are any cars or no cars, how much time you have to do it.

Q. Is there any way to look and see if anybody is in the lane to your right?

A. Yes.

Q. How?

A. We have mirrors, double mirrors. One big one, and the little one even has an augmentation to it.

Q. And that's on the side of the tractor?

A. Yeah.

Q. You have one on each side?

A. One for each side.

Q. And to your right side, is there a blind

Page 47

spot for sure as a driver?

A. Yeah, our mirror -- trucks have -- well, our trucks have two on the -- it's for each door, and two up front at the fender.

Q. Okay.

A. Which those -- that -- those there are the ones that see the blind spots.

Q. Okay. So the truck you had on the day of this accident did not have a blind spot?

A. No, they didn't have none.

Q. So you had a mirror on the right front fender and a mirror on the right door?

A. Yeah, mirror.

Q. And using both of those mirrors, you could see the entire lane to your right?

A. All of it.

Q. There is no blind spot within that lane?

A. No, no. You can see. You can see.

Q. And you agree, don't you, that you have to yield to all traffic before changing lanes, even if you have a flat tire?

MR. ECHOLS: Object to form.

A. Yes.

Q. In other words, as a professional driver, if you have a flat tire, you still have

Page 48

to make sure you can get off the roadway safely?

MR. ECHOLS: Object to form.

A. Yes.

Q. You said you have never had a flat tire driving a truck?

A. Like a front tire flat, no.

Q. Anytime?

A. No. Front one, never.

Q. How about a rear tire or a trailer tire?

A. Yeah.

Q. You have had those before?

A. Yeah. Flat. Flat.

Q. I'm sorry?

A. Flat tires.

Q. And when that happens, how do you, as a driver, learn that you are having a problem with the tire?

A. No. The driver is always looking, watching out through the mirrors of the trailer of the truck. And these tires on the truck never get a flat from the air seeping out of them, though.

Q. Why is that?

A. Because they are new. They are almost always new, those tires. If there is a problem

12 (Pages 45 to 48)

BRICKELL KEY COURT REPORTING, LLC
305.407.9993

OSMANY SANCHEZ
8/22/2018

Page 49

with the tires, it would be that they burst, but not that they get a flat.

Q. Has that happened to you before, before this accident?

A. Do you mean to say that I have had any flat tire?

Q. Yeah, or any problem with the tires before.

MR. ECHOLS: Object to form.

A. Well, no, I have had problems with tires.

Q. I thought you said a moment ago, you said you had some problem with trailer tires.

A. Yes. But as to the tires get -- going flat on me, what they do is more burst on you because of the load you are carrying, but they never get flat.

Q. What I'm trying to understand, as a driver, how do you know you are having a problem with the tire?

MR. ECHOLS: Objection to form.

A. Well, no, the tire bursts, poof, but you are always checking -- you are always checking the mirrors. You are always checking by ear. By ear, they make a sound, they go boom.

Page 50

Q. Do you feel it?

A. And the tire dislodges away from the rim.

Q. But does that make the truck drive differently or feel differently as you drive?

A. Yeah, yeah. You can feel. You notice right away on the truck.

Q. How many times did that happen to you where you have been driving and had a problem with the tire, either on the trailer or on the tractor; how many times?

MR. ECHOLS: Object to form.

A. That I can remember, only one time.

Q. That's the day of this accident, or another time?

A. No. On another occasion, a trailer.

Q. A trailer tire?

A. A trailer, yeah.

Q. Okay. In that case, did you move the tractor on the trailer all the way off the road?

A. You have to get off of the road, over to the -- to the shoulder, to the shoulder of the road.

Q. And if you are driving down the interstate and you are having a problem with the

Page 51

tire, which side of the road do you try to get off if you have a problem?

A. No, you will always -- and remember there is always eight tires -- always -- look, the trailer has eight tires, so you decrease your velocity, and you give yourself enough time to go off to the shoulder.

Q. Do you always go to the right shoulder even if there is a left shoulder?

A. We are always obligated to stop on the left shoulder -- no, I mean, no the right shoulder.

Q. And in this particular accident, the day of this particular accident, do you recall when the last time would have been that you inspected the air pressure of the tire that you had a problem with?

A. Yeah, before setting out for the trip.

Q. Okay. And I said specifically the PSI, the tire pressure, other than eyeballing it, did you do anything else to check the tire pressure before you left?

A. Yeah, before setting out on a trip, you do a maintenance checkup of the truck.

Q. We talked about an hour ago, you said

Page 52

you never put a tire gauge to it. You looked at it and determined whether the air pressure was okay?

MR. ECHOLS: Object to form.

A. When you do a maintenance, when it's due for the truck, a maintenance, you check for each tire, how many pounds of air pressure it has.

Q. And that's every 7 or 10,000 miles, what you referred to earlier, right?

A. No. When you check everything in it, when you do a general maintenance, yeah, for the truck, yeah, that's every 7 or 10,000 miles.

Q. This accident was January 26. Can you tell me what day it was the last time an air gauge was put to this tire to see how much air pressure was in it?

A. No, I don't remember. No, I don't remember.

Q. In this case, Mr. Fernandez Sanchez, what was your first notice -- what happened that was your first notice that you had a problem with your tire?

A. Well, no, it really didn't at any point give notice of its problem.

Q. So you never knew you had a problem with

13 (Pages 49 to 52)

BRICKELL KEY COURT REPORTING, LLC
305.407.9993

OSMANY SANCHEZ
8/22/2018

Page 53

your tire?

MR. ECHOLS:  Object to form.

A.  Well, no, I knew of a problem, but you are asking me if I had any prior notice.

Q.  No.  I'm asking you what happened that made you think you had a problem with the tire.

A.  Well, no, the tire burst.  It burst, the tire.  And I felt the truck going -- it trembled.  It shook.

Q.  When you say the tire burst, does that mean you heard it with your ears, or you felt it with your hands?

A.  No, no, I felt it in the vibration in my hands, the tire.  The tire burst and I felt -- I felt it like this.  I didn't know which -- that it was that tire.  I didn't know which tire it was.

Q.  It was obvious to you, though, that when you felt that, that you had a problem with one of your tires?

A.  I know that there was a problem because I felt the change in the truck.

Q.  And when that happened, what lane were you in?

A.  I was in the second lane, if I remember

Page 54

correctly.

Q.  Let me show you the accident report drawing, and let you look at that and see if that squares with your recollection of where you were when you had the problem with the tire, what lane you were in.

A.  Yes, sir.

Q.  So as you -- when you had the problem, there was one lane to your right, and then the shoulder of the road?

A.  Yes.

Q.  And you had three lanes to your left?

A.  Yes.

Q.  Okay.  Do you know what happened to your tire, why it did what it did?

A.  No.

Q.  Do you know if you hit something in the road?

A.  No.

Q.  Do you have any idea why the tire failed like it did?

A.  No.

Q.  And when the tire blew, as you have described, you still had control of the vehicle, correct?

Page 55

A.  Yes.

Q.  You could still steer it, and operate it, and accelerate it?

A.  Yes, yes.  It was controlled at every moment.  Yes, controlled.

Q.  Do you have any idea how much the vehicle weighed at the time of the accident?

A.  It's in the paperwork for the load, but I don't remember exactly.

Q.  And at the time of the accident, it was nighttime?

A.  It had not become dark.  It was not night.  It was twilight.

Q.  And it was clear, and not raining, correct?

A.  No, not raining.

Q.  And the section of the road where this accident happened was a wide, flat, straight stretch, right?

A.  Yeah, wide and flat.

Q.  And when you first felt the tire had a problem, how fast were you going?

A.  I don't remember exactly.  But it was not easy, because I had gone from the overpass, the bypass, onto I-75.

Page 56

Q.  My question, though, is when you first felt the problem with the tire, what was your speed?

A.  I don't remember.

Q.  Do you have any idea at all?

A.  No.

Q.  And after you felt the tire do what you described, it was your intention to pull your vehicle off of the roadway to the right?

A.  Yeah, but the truck doesn't move forward when the tire is blown out, it doesn't exit.

Q.  What does that mean?

A.  Given that the truck didn't have a tire, the tire burst, and the truck remained there, right there in the lane, okay?

Q.  My question, your intent, was it your intent to move over to the side of the road?

A.  No, no.

Q.  You were just going to keep driving down the road, or were you going to stop?

A.  No, no.  The truck was already stopped, and I was going to get out.

Q.  Why was the truck stopped?

A.  Because of the tire that it had let go, the tire.

14 (Pages 53 to 56)

OSMANY SANCHEZ
8/22/2018

Page 57

Q. I thought you said you could continue to drive the truck after you heard that noise?

MR. ECHOLS: Object to form.

A. No. The tire burst, and the truck did not move. It didn't move, not even -- it's only a few feet.

Q. So once the tire did what it did, or blew as it did, the truck stopped?

A. It stopped.

Q. How quickly?

A. A few feet. At the moment. At the moment.

Q. A few feet, after you felt your tire shake, the vehicle was completely stopped?

MR. ECHOLS: Object to form.

A. Only a few feet, and then the truck was already stopped.

Q. And when it was stopped, was it entirely within that second lane?

A. Inside that lane, yes.

Q. In other words, all the tires of the tractor and all of the tires of the trailer were within that lane?

A. In that same lane.

Q. And had you been in that same lane since

Page 58

you got off of 475, onto 75?

MR. ECHOLS: Object to form.

A. In that lane, I was inside, set out from the other.

Q. So prior to this accident, or after this, you never changed from that lane; is that what you are saying?

THE INTERPRETER: Sir, could you repeat the question?

BY MR. SURVANT

Q. Sure. You never moved into any other lane other than that lane?

A. Well, no, I'm not going to remember if I got out of it.

Q. Did you feel getting hit?

A. When I'm already stopped at that place, I felt the blow.

MR. SURVANT: The interpreter needs clarification. In Spanish, especially Cuban Spanish, S-E-N-T-I-R is used to feel, but also to hear, so if you want me to clarify whether he felt or heard?

(After clarification, and through the interpreter.)

A. They hit me. I was there, and stopped,

Page 59

and they hit me in the rear.

Q. So you felt Mr. Allen's vehicle hit the back of the trailer?

A. Yes, I felt it.

Q. And it's your testimony that at the time that he hit you, you completely stopped?

A. I was fully stopped.

Q. And how long had you been completely stopped before you got hit?

A. I don't remember. I don't remember.

Q. Was it a matter of one or two seconds, or longer?

A. I don't remember. I don't remember how much.

Q. Were you still holding onto the steering wheel when you got hit?

A. I don't remember at that moment exactly, no.

Q. So prior to the accident, you had never checked either the left lane or the right lane for traffic; is that fair?

MR. ECHOLS: Object to form.

A. How is that?

Q. Did you ever check the traffic in the right lane?

Page 60

MR. ECHOLS: Object to form.

A. Whether I checked at the moment of the accident whether any traffic was coming there?

Q. Let me ask it this way. You said that when the tire blew, you were in this number two lane and you stopped completely, right?

A. Yes.

Q. And your plan was to sit there until help got there; is that right?

A. No, no, no. My plan was to get out of the truck and place the cones and triangles out, the triangle.

Q. But your plan wasn't to move the truck out of the number two lane?

A. You could not move it.

Q. You were alone at the time of the wreck, correct, nobody else was in your tractor?

A. No.

Q. Were you on the phone at the time of the accident?

A. No.

Q. Did you have a cellphone with you at the time of the accident?

A. With me?

Q. Yes.

15 (Pages 57 to 60)

Page 61

A. No. In the truck, yeah, my phone.

Q. Who was your provider at the time of the accident?

A. AT&T.

Q. What was your phone number?

A. (786)973-3044.

Q. And were you the named person on that account?

A. Yes.

Q. And prior to the accident, when would have been the last time that you either made a phone call from that phone or sent a text on that phone?

A. I don't remember.

Q. After the accident, did you use your cellphone?

A. Yes.

Q. And who did you call?

A. The company.

Q. Who did you speak with at the company?

A. With the lady who was on duty, on guard, on duty.

Q. When you spoke to her, had any police or ambulance or anybody like that gotten to the scene?

Page 62

A. Yes.

Q. Who?

A. The police.

Q. Do you call your company before the police got there, or after the police got there?

A. I don't remember. I don't remember.

Q. After you felt the vehicle hit your truck, what did you do?

A. I got out of the truck. I was helping, giving aid to that man. And a tractor-trailer who was coming behind mine, he is the one who called 911.

Q. When you said you gave aid to the man, are you talking about Mr. Allen, the gentleman that was in the accident with you?

A. Yeah, in the accident. I got out of the truck and I helped because he wound up over like there (gesturing).

Q. Did his car end up as it's shown on the accident report?

A. Like that. A bit more like over here (indicating).

Q. More off of the road?

A. No, no, no, no. More in front, further up in front of my truck, beyond my truck.

Page 63

Q. And what did you observe about Mr. Allen's condition, the driver of that vehicle?

A. No. When giving him the first aid -- at first I was there by myself, and later two female nurses came over. I was trying to open up the door for them, and the two nurses were giving him first aid.

Q. Was he awake, alert?

A. No. At the moment he did recover. But he was alert -- he was alert when the two girls -- they were like two nurses -- took me out from there. They asked me to move out of there, and they occupied my place.

Q. Do you recall anything Mr. Allen had to say at the scene of the accident?

A. I don't remember.

Q. Have you ever, to your knowledge, spoken to Mr. Allen about his condition or his injuries or the accident?

A. No.

Q. And it's your testimony that at the time of impact between your vehicle and Mr. Allen's vehicle you were completely stopped?

A. It was stationary.

Q. And did you talk to the police officer

Page 64

about how the accident happened while at the scene?

A. Yes.

Q. And as I understand it, you were able to talk to him with the help of an interpreter at your company; is that how you recall it?

A. Yes, but apart from that, the persons who stopped there, there were two -- they was -- next to me, there was like a tractor-trailer stopped. That the officers took from them -- that's to say -- they spoke with them, and they served for me talking with the police officer. And after that, an officer arrived who did speak Spanish.

Q. Okay. But whenever you spoke to the police officers, either in Spanish or through an interpreter, you told him how the accident happened, correct?

THE INTERPRETER: Sorry could you repeat the question --

MR. SURVANT: Yeah.

THE INTERPRETER: -- could you --

MR. SURVANT: I can do it.

BY MR. SURVANT

Q. When you spoke to the police officer

16 (Pages 61 to 64)

OSMANY SANCHEZ
8/22/2018

Page 65

either in Spanish or through an interpreter, you told him how you remembered the accident happened?

A.  Yes.

Q.  And you told -- would you have told the police officer that you were completely stopped at the time of the accident?

A.  Yes.

Q.  Would you have told the police officer that you were in the number two lane the entire time?

A.  During the whole time of the accident occurring, yes.

Q.  You would not have told the police officer that you were moving lanes from the fourth lane to the fifth lane at the time of the accident?

A.  I wasn't -- I was not changing lanes at the moment of the accident.

Q.  So you would deny telling the police officer that you were changing lanes at the time of the accident?

A.  The tire burst.  And the same accident [sic] in which the tire burst, that's where the truck remained.  And --

Page 66

THE INTERPRETER:  And S-I-C in paren, he meant lane, but he said accident.

COURT REPORTER:  He meant what? Lane but he said --

THE INTERPRETER:  Lane but he said accident.  He said accident but he meant lanes. You have to put S-I-C there.

COURT REPORTER:  Will do.

BY MR. SURVANT:

Q.  After the accident, did you go back to look for the tire?

A.  No, they took away the -- DOT used a tow truck to take away the tractor-trailer, or to a terrain -- a place that was enclosed.

Q.  The rubber came completely off the wheel, right?

MR. ECHOLS:  Object to form.

A.  Yeah, the tire itself was totally lost, yeah, totally ruined.

Q.  Do you know -- I'm sorry.  Do you know if it came off in one piece, or whether it came off in pieces, or tore, or broke?

A.  I don't -- I don't remember exactly how it happened.

Q.  Okay.  But as soon as it happened, you

Page 67

stopped within feet of feeling it, correct?

A.  Some feet.

Q.  At the time that you were hit, were your hazard lights on?

A.  Yes.

Q.  When did you turn those on?

A.  As soon as I stopped and parked, I put on those lights.

Q.  But you don't know how long it was between stopping and getting hit?

MR. ECHOLS:  Object to form.

A.  No, I don't remember.

Q.  You agree it was very quick, though?

MR. ECHOLS:  Object to form.

A.  Yeah.  I don't remember exactly.  I don't remember.

Q.  And since you were going straight at the time you had the tire problem, you would not have had a turn signal on, correct?

A.  No, no.  When the tire burst and the truck stopped, then I put the -- I put the stop lights, the parking lights on, the signals on.

Q.  Did you use your brakes at all after you felt the tire?

A.  Yeah.

Page 68

Q.  Did you use your brakes as soon as you felt any problem with the tire?

A.  No, no.  You can't suddenly brake, put the brakes on.  You have to steer it so that there is no problem and you can be able to stop.

Q.  And when you did -- you did apply your brakes at some point?

A.  When I was stopping, or when the truck stopped, yeah.

Q.  What I'm trying to understand is whether you coasted to a stop, or whether you used your brakes to stop.

A.  No, no.  You can't -- no, no.  You can't put the brakes on.  You can't brake it, because it was fully loaded, so you let it have its displacement on the road.  No, no.  The truck doesn't like stop.  Braking for stopping.

Q.  My question, though, is after you felt the tire, did you ever touch the brake pedal with your foot?

A.  Whether you mean --

THE INTERPRETER:  For the full translation of the question.

A.  You mean, whether I suddenly applied my brakes?

BRICKELL KEY COURT REPORTING, LLC
305.407.9993

OSMANY SANCHEZ
8/22/2018

Page 69

MR. ECHOLS:  Gradually.

BY MR. SURVANT

Q.  No, whether you touched it at all.

THE INTERPRETER:  Listen to the question.

Could you repeat the question?

BY MR. SURVANT

Q.  Sure.  Between the point in time when you felt the tire and when you stopped, between there, did you ever put your foot on the brake pedal?

A.  I don't remember.  I don't remember that.

Q.  And I think I asked you this, but you have no idea why the tire did what it did?

A.  No.

Q.  Did you ever attempt to figure out what happened to it?

A.  No.  Not that, no.

Q.  Did Caribe Trucking, to your knowledge, ever do anything to try to figure out what happened to your tire?

MR. ECHOLS:  Object to form.

A.  No.  DOT are the ones that took evidence and took photos and everything.  The police and

Page 70

DOT are the ones who inspected the area, and took photos, and did what they did with the tire.  They put me over to one side.

Q.  Did the wheel have to be replaced on the tractor?

A.  They changed the tire and everything else.  They changed everything.

Q.  The metal part of the wheel, did that have to be replaced?

THE INTERPRETER:  Just listen to the question.

The interpreter is going to repeat the question.

(Retranslating question)

BY MR. SURVANT

Q.  The metal part of the tire that's shown that was left after this, did you ever replace it or repair it?

A.  Yeah, after the accident, they replaced that.

Q.  They replaced the rubber part of the tire as well as the metal part of the wheel?

A.  Afterwards, they had to replace this.

THE INTERPRETER:  Repeat.

(Clarifying in Spanish with witness)

Page 71

A.  Look, upon there not being any tire because it was blown away, you cannot mount any other rim on there.

Q.  Let me do it this way.  The wheel that's on the tractor today, is that the same wheel that was on the tractor at the time of the accident?  The wheel being the metal part, this part.

A.  No, no.  They replaced that, along with the rim, and everything else.

Q.  I figured they did.  I was just asking.  When was it replaced?

A.  Yeah, DOT sent road service with a tire and everything, and they replaced that.

Q.  And then where did you go?

A.  The truck and -- the DOT and the police took the truck over to a closed-in area.

Q.  Then what happened?

A.  They did -- well, they had it there in a location, a closed-in location, for three days.  And -- well, that was on a Friday.  And Monday, they called me over to the place for an inspection, and they did an inspection.

Q.  They, being who?

A.  DOT.

Page 72

Q.  And what did they tell you about that inspection, if anything?

A.  Yeah.  All of that inspection, Caribe has that.

Q.  Do you know if anyone ever figured out why the tire did what it did?

A.  I don't know.

Q.  And I think I asked you, but the tire that failed, do you know where you bought it?

A.  No.

Q.  Will you have a record of buying it or having it mounted anywhere?

A.  No, no.  I don't recall, no.

Q.  At the time of this accident, did you have a Commercial Driver's License -- Commercial Driver's License?

A.  Yes.

Q.  And when did you first get your CDL?

A.  Exact date, no, I don't remember.

Q.  Approximately?

A.  It was either '14 or '13; 2013 or 2014.

Q.  And was it a CDL issued in the state of Florida?

A.  Yes.

Q.  Have you ever, to your knowledge, seen

18 (Pages 69 to 72)

OSMANY SANCHEZ
8/22/2018

Page 73

the Commercial Driver's License for Georgia -- excuse me, the Commercial Driver's License manual for Georgia.

A. Georgia, no.

Q. Have you ever read or received any training about the Federal Highway Administration Commercial Vehicle Preventable Accident Manual?

THE INTERPRETER: Could you repeat?

BY MR. SURVANT

Q. Sure. Have you ever heard of or seen the Federal Highway Administration Commercial Vehicle Preventable Accident Manual?

A. For Georgia, no.

Q. No, for everywhere?

A. I don't recall. No, I don't remember.

Q. Do you have any idea what the Federal Motorists Carrier Safety Regulations say about how to safely operate a tractor-trailer?

MR. ECHOLS: Object to form.

THE INTERPRETER: About what?

BY MR. SURVANT:

Q. About safely operating a tractor-trailer.

A. Yeah, yeah. That, I have.

Page 74

Q. What did that say?

MR. ECHOLS: Object to form.

THE INTERPRETER: Can you repeat the question?

BY MR. SURVANT

Q. What do the Federal Motor Carrier Safety Regulations say about safely operating a tractor-trailer?

MR. ECHOLS: I am going to object to the form of the question as phrased. It is impossibly vague and compound.

A. I don't understand the question.

Q. Do you know if there is a regulation that pertains to what to do if you have a tire blowout?

A. We know all of the -- remember, I told you we follow all of the laws.

Q. What do they say to do when you have a blowout?

THE INTERPRETER: Counsel, do you mean blowout, or flat tire?

MR. SURVANT: Both. Either.

MR. ECHOLS: Object.

A. But those things are not set exactly. Because circumstances -- things happen in

Page 75

different types of circumstances.

Q. Are you aware of a regulation that says what you are supposed to do if you have a flat tire or a blown tire?

MR. ECHOLS: Objection, vague.

A. Yes. Yeah. Take all necessary measures.

Q. To do what?

A. To park without any problem, as I said.

Q. Why didn't you pull your truck off the road?

A. No, you couldn't -- you couldn't move it, because it was a front tire.

Q. Are you saying it was not possible to move the vehicle?

A. Yeah.

Q. I just want to go through some documents with you that were produced, and see if you recognize what any of these are. You may not. If you don't, just tell me you don't. And they are in English. I think we have already covered you don't read English, right?

A. No, no. I don't.

Q. Let me show you Exhibit 2, and see if you can identify anything on there you may have

Page 76

written.

(Plaintiff Exhibit Number 2 was marked for identification)

A. Yes.

Q. Did you write any of that?

A. Yes.

Q. What did you write?

A. My name, my address, the date, everything.

Q. Do you know what this document is?

A. No.

Q. Exhibit 3 looks like it's from the IRS.

(Plaintiff Exhibit Number 3 was marked for identification)

BY MR. SURVANT:

Q. Do you recognize Exhibit 3?

A. No, I don't know. I can't read it.

Q. And Exhibit 4 looks like a contract that you had between Caribe Trucking and your company.

(Plaintiff Exhibit Number 4 was marked for identification)

BY MR. SURVANT:

Q. Do you recognize that?

A. I don't even understand it. No, I don't

19 (Pages 73 to 76)

BRICKELL KEY COURT REPORTING, LLC
305.407.9993

OSMANY SANCHEZ
8/22/2018

Page 77

know what it is.  I can't read it.

Q.  Is your signature or your initials on Exhibit 4 anywhere?

THE INTERPRETER:  Before the translation of his last question.

(Before translation of question, through interpreter.)

A.  If that's the contract, the Caribe contract --

THE INTERPRETER:  What was your question?

BY MR. SURVANT:

Q.  I just want to know if he signed it or initialed it anywhere.

A.  Yes.  Yes.

Q.  Exhibit 5 looks like an employment verification form that was filled out.

(Plaintiff Exhibit Number 5 was marked for identification)

BY MR. SURVANT:

Q.  Is any of that in your handwriting?

A.  Yeah.

Q.  What part is yours?

A.  My signature (indicating).

Q.  And then Exhibit 6 is a taxpayer ID

Page 78

number W9 Form.

(Plaintiff Exhibit Number 6 was marked for identification)

BY MR. SURVANT:

Q.  Does that likewise have your signature on it?

A.  Yes.

Q.  And Exhibit 7 are copies of your current resident card, and Florida driver's license, and Social Security card; is that right?

(Plaintiff Exhibit Number 7 was marked for identification)

A.  Yes.

Q.  And 8 looks like a Medical Examiner's Certificate.

(Plaintiff Exhibit Number 8 was marked for identification)

BY MR. SURVANT:

Q.  Is any of that your handwriting?

A.  Yes.

Q.  What part is your handwriting?

A.  My signature.  My signature.

Q.  And Exhibit 9 looks like a driver's road test examination.

(Plaintiff Exhibit Number 9 was

Page 79

marked for identification)

BY MR. SURVANT:

Q.  Is any of that yours?

A.  Not my handwriting.

Q.  There is date of January 8th of '18.  Do you recall giving a driver road test examination about a week or two before this accident?

A.  Can you repeat the question?

Q.  Sure.  Do you recall giving a road test from Caribe within a couple of weeks of this accident?

A.  Yeah.

Q.  Was that the only road test you were given by Caribe, the one dated January 8, 2018?

A.  I don't remember.

Q.  Okay.  And Exhibit 10 is another form pertaining to the same road test.  This is a Record of Road Test.

(Plaintiff Exhibit Number 10 was marked for identification)

BY MR. SURVANT:

Q.  Is that -- any information on that two-page document in your handwriting?

A.  No.

Q.  And that Exhibit 11 is a document called

Page 80

Certification of Road Test, and it's dated also January 8th, 2018.

(Plaintiff Exhibit Number 11 was marked for identification)

BY MR. SURVANT:

Q.  Is that your signature at the bottom of that page?

A.  Yeah.

Q.  And this says that on January 8, 2018, your road test consists of approximately seven miles of driving.  Does that sound right?

A.  Oh, yeah.

Q.  Exhibit 12 looks like a postaccident Alcohol Testing Form.

(Plaintiff Exhibit Number 12 was marked for identification)

BY MR. SURVANT:

Q.  Have you ever seen that?

A.  Yeah, yeah.  The alcohol testing form.

Q.  When did they do that test?

A.  The day of the accident -- no, the day after the accident.

Q.  Exhibit 13 is a Certificate of Compliance with Cell Phone/Texting Bans.

(Plaintiff Exhibit Number 13 was

20 (Pages 77 to 80)

BRICKELL KEY COURT REPORTING, LLC
305.407.9993

OSMANY SANCHEZ
8/22/2018

Page 81

                marked for identification)
BY MR. SURVANT:
     Q.  Have you ever seen Exhibit 13?
           THE INTERPRETER:  Did you say --
BY MR. SURVANT:
     Q.  Have you ever seen it?
     A.  Yeah.
     Q.  Is your signature on there anywhere?
     A.  Yes.
     Q.  Do you have any idea what it says about
what the policy is?
           MR. ECHOLS:  Object to form.
     A.  Yeah.
     Q.  You can't read that, can you?
     A.  No, no.  Not to read the text, no.
     Q.  Exhibit 14, frankly, I don't know what
that is.
           (Plaintiff Exhibit Number 14 was
           marked for identification)
BY MR. SURVANT:
     Q.  Do you know what that is?
           THE INTERPRETER:  I'm sorry --
           MR. SURVANT:  Does he know what it
is.
     A.  Well, this here is the truck's number.

Page 82

     Q.  474?
     A.  474, it was with Caribe.
     Q.  15 looks like insurance information,
which you don't know anything about probably.
           (Plaintiff Exhibit Number 15 was
           marked for identification)
BY MR. SURVANT:
     Q.  16 is State of Florida Apportioned Cab
Car.
           (Plaintiff Exhibit Number 16 was
           marked for identification)
BY MR. SURVANT:
     Q.  Do you have any idea what that is?
     A.  Yeah.
     Q.  Do you know what that is?
     A.  Yeah, this is the registration for the
truck.
     Q.  And then Exhibit 17, is record of annual
inspection, dated December 4th, 2017.
           (Plaintiff Exhibit Number 17 was
           marked for identification)
BY MR. SURVANT:
     Q.  Do you recognize that document?
     A.  Yes.
     Q.  Is your signature, initials, or name on

Page 83

there anywhere?
     A.  No.
     Q.  It says Qualified Inspector's Signature
right here, and there is a signature.  That's
not yours, correct?
     A.  No, that's the inspector's.
     Q.  And when the inspections are done, those
annual inspections aren't done by you; is that
right?
     A.  No.
           MR. ECHOLS:  Object to form.
BY MR. SURVANT:
     Q.  And then 18 looks like a preemployment
drug test.
           (Plaintiff Exhibit Number 18 was
           marked for identification)
BY MR. SURVANT:
     Q.  Have you seen that?
     A.  Yeah.
     Q.  And 19 is what, if you know?
           (Plaintiff Exhibit Number 19 was
           marked for identification)
     A.  These are permits for -- I don't know
exactly what it means, what it's for.
     Q.  And Exhibit 20, it looks like it has to

Page 84

do with a drug test.  It looks like it was
January 16th of 2018?
           (Plaintiff Exhibit Number 20 was
           marked for identification)
           THE INTERPRETER:  Did you say
January 16?
BY MR. SURVANT:
     Q.  Yeah.  Do you know what this is?
           THE INTERPRETER:  I am sorry, could
you repeat that, I didn't get the date.
           MR. SURVANT:  Right here, January --
it's hard to read.  1/16/18 is what it looks
like.
     A.  Yeah.  We get drug tested.
     Q.  How often?
     A.  When you are going to enter the company,
and when we have -- well, me, they put me
through a drug test when I was going to enter to
the company.
           MR. ECHOLS:  And BJ, just for the
record, for clarification, Exhibit 18, has a
specimen collection date of 1/10/18 --
           MR. SURVANT:  So that goes with the
other one.
           MR. ECHOLS:  So that might be 1/10

21 (Pages 81 to 84)

BRICKELL KEY COURT REPORTING, LLC
305.407.9993

Page 85

instead of 1/16.

MR. SURVANT: Those forms probably go together then, 18 and 20.

MR. ECHOLS: Yeah.

BY MR. SURVANT

Q. 21 looks like it's a Florida MVR report.

(Plaintiff Exhibit Number 21 was marked for identification)

BY MR. SURVANT:

Q. Have you ever seen that?

A. No, I can't recall.

Q. And Exhibit 22 is a request for a driving record.

(Plaintiff Exhibit Number 22 was marked for identification)

BY MR. SURVANT:

Q. Have you ever seen that?

A. Yes.

Q. And I think we covered this, but just to be clear, other than the accident we are here about today, have you been involved in any other accidents as a truck driver?

A. No.

Q. How about driving a passenger car or a pickup truck without a tractor, any other

Page 86

accidents?

A. No, no.

Q. Okay. How about traffic tickets, have you ever received a traffic ticket either in a personal automobile, or a truck, or a tractor-trailer, any sort of traffic ticket or moving citation?

A. You mean for accident?

Q. No. Speeding, changing lanes, improper -- any traffic violations.

A. No. Ticket, no, no, no.

Q. Have you ever received any sort of citation from a failed inspection before of your vehicle --

A. No.

MR. SURVANT: Thank you, sir. That's all I have.

THE WITNESS: That's okay. Can I go to the bathroom?

MR. SURVANT: Sure.

MR. ECHOLS: I don't have any questions.

Chris?

MR. WOLFE: No.

MR. ECHOLS: We'll read.

Page 87

COURT REPORTER: Are we ordering, or do you want to wait?

MR. SURVANT: Yes, I will order.

MR. ECHOLS: Etran, please.

(Deposition concluded at 1:15 p.m.)

Page 88

CERTIFICATE OF OATH
OF INTERPRETER

STATE OF FLORIDA
COUNTY OF MIAMI-DADE

I, the undersigned authority, certify that

MARIO CAMARA personally appeared before me and was

duly sworn on the 22nd day of August, 2018.

Signed this 26th day of August, 2018.

_____
REBECCA HUGHEN, COURT REPORTER
Notary Public, State of Florida

22 (Pages 85 to 88)

Page 89

CERTIFICATE OF OATH
OF WITNESS

STATE OF FLORIDA        )
COUNTY OF MIAMI-DADE     )


        I, the undersigned authority, certify that

OSMANY F. SANCHEZ personally appeared before me and

was duly sworn.

        WITNESS my hand and official seal this 26th

day of August 2018.




                    _____
                    Rebecca Hughen
                    Notary Public - State of Florida

---

Page 90

CERTIFICATE OF REPORTER

STATE OF FLORIDA        )
COUNTY OF MIAMI-DADE     )

        I, Rebecca Hughen, Court Reporter, do hereby
certify that I was authorized to and did
stenographically report the deposition of OSMANY F.
SANCHEZ; that a review of the transcript was
requested; and that the foregoing transcript is a
true and complete record of my stenographic notes.
        I FURTHER CERTIFY that I am not a relative,
employee, or attorney, or counsel of any of the
parties, nor am I a relative or employee of any of
the parties' attorney or counsel connected with the
action, nor am I financially interested in the
action.
        DATED this 26th day of August, 2018, at
Miami-Dade County, Florida.




        _____
        Rebecca Hughen

---

Page 91

ERRATA SHEET
DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
In Re:  JAMES ALLEN, JR. AND RACHEL VS. OSMANY
        F. SANCHEZ, CARIBE TRUCKING, ET AL
         Case No.:  5:18-CV-00145-MTT
              OSMANY F. SANCHEZ
               August 22, 2018

PAGE   LINE       CHANGE              REASON
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

Under penalties of perjury, I declare that I have
read the foregoing document and that the facts
stated in it are true.
_____              _____
Date                      OSMANY F. SANCHEZ

---

Page 92

CERTIFICATE OF DEPONENT

STATE OF FLORIDA    )
                    ) ss.
COUNTY OF MIAMI-DADE)

        I, the undersigned, declare under
penalty of perjury that I have read the
foregoing transcript, and I have made any
corrections, additions, or deletions that I was
desirous of making; that the foregoing is a true
and correct transcript of my testimony contained

therein.

        EXECUTED this _____ day of _____,

20____, at _____, _____.

                (City)            (State)




                    _____
                    OSMANY F. SANCHEZ

BRICKELL KEY COURT REPORTING, LLC
305.407.9993